Ivey **GILMORE**, Plaintiff,

v.

**MONY LIFE INSURANCE COMPANY OF AMERICA**, Defendant.

No. Civ.A. 00–T–84–N.

United States District Court,
M.D. Alabama,
Northern Division.

Oct. 9, 2001.

K. Stephen Jackson, Jeffrey S. Daniel, Jackson & Shuttleworth PC, Birmingham, AL, for Ivey Gilmore, plaintiff.

James W. Gewin, Michael R. Pennington, Julie S. Elmer, Bradley, Arant, Rose & White, LLP, Birmingham, AL, for Mony Life Insurance Company of America, a corporation defendant.

## OPINION

MYRON H. THOMPSON, District Judge.

Plaintiff Ivey Gilmore filed this lawsuit in the Circuit Court of Barbour County, Alabama against defendant MONY Life Insurance Company of America alleging several Alabama state-law claims stemming from his purchase of a variable annuity contract from MONY. Gilmore seeks to represent a class of persons similarly situated to himself. MONY removed the lawsuit to this court under the Securities Litigation Uniform Standards Act of 1998 (SLUSA), Pub.L. No. 105–353, 112 Stat. 3227, 15 U.S.C.A. § 77p(c), and 28 U.S.C.A. § 1441. This lawsuit is currently before the court on Gilmore's motion to remand and MONY's motion for summary dismissal or judgment on the pleadings. For the reasons that follow, the court will deny Gilmore's motion and grant MONY's "pursuant to SLUSA's directive that all such class actions be based exclusively on federal law." *Lander v. Hartford Life & Annuity Insur. Co.*, 251 F.3d 101, 104 (2nd Cir.2001).

### I. FACTUAL SUMMARY

The facts, as alleged by Gilmore, are as follows: Gilmore opened an individual retirement account (IRA) with MONY; the IRA provided for tax deferment on investment earnings. However, a MONY sales agent told Gilmore that, in order to invest in mutual funds on a tax-deferred basis

through his IRA, he would have to purchase a variable annuity. The agent recommended that Gilmore purchase a MONY variable annuity, called the Flexible Payment Variable Annuity Contract, which Gilmore then purchased. Gilmore, however, did not need the variable annuity in order to receive income tax deferral on mutual funds or other investments in his IRA.

On December 10, 1999, Gilmore filed a complaint in the Circuit Court of Barbour County, Alabama against MONY. He asserted state-law claims for unjust enrichment, money had and received, conversion, breach of contract, negligent-and-wanton training, negligent-and-wanton supervision, breach of fiduciary duty, deceit, and continuing deceit. Gilmore seeks to represent a class consisting of (1) "[a]ll persons throughout the United States who have purchased a variable annuity from MONY in a tax deferred qualified retirement plan"; (2) "[a]ll persons throughout the United States who were charged unnecessary fees for double tax deferral for variable annuities held in qualified retirement accounts"; and (3) "[a]ll persons throughout the United States who were sold variable annuities while owning a tax deferred qualified retirement plan from MONY." Gilmore requests compensatory damages totaling $ 74,999 for himself and for each putative class member.

MONY filed a notice of removal in this court on January 27, 2000. Gilmore filed a motion to remand on February 25, 2000. On March 10, 2000, MONY filed a motion for summary dismissal or judgment on the pleadings.

## II. DISCUSSION

MONY removed this lawsuit based on four theories of federal jurisdiction. First, according to MONY, Gilmore's claims are superpreempted by SLUSA, and, therefore, Gilmore's lawsuit is removable under 15 U.S.C.A. § 77p(c). Second, MONY contends that Gilmore's claims are superpreempted by the Employee Retirement Income Security Act of 1974, 29 U.S.C.A. §§ 1001–1461. Third, MONY contends that Gilmore's lawsuit presents a federal question because federal tax laws form an integral element of his state-law claims. And, fourth, MONY contends that the court has diversity jurisdiction over Gilmore's claims. Gilmore disagrees with each of MONY's theories.

■ Under SLUSA, a private party cannot maintain certain class-action lawsuits alleging violations of state law in connection with the purchase or sale of securities. Specifically, subsection (b) of § 77p of SLUSA provides:

"No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging—

(1) an untrue statement or omission of a material fact in connection with the purchase or sale of a covered security; or

(2) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security."

15 U.S.C.A. § 77p(b). And subsection (c) of § 77p provides that a class-action lawsuit brought in state court that satisfies subsection (b) is removable to federal court: "Any covered class action brought in any State court involving a covered security, as set forth in subsection (b), shall be removable to the Federal district court for the district in which the action is pending, and shall be subject to subsection (b)." 15 U.S.C.A. § 77p(c). As a result, subsections (b) and (c) together provide for the removal and dismissal of certain lawsuits based on state law. Through SLUSA and other statutes, Congress intended to preempt state law and "provide national,

uniform standards for the securities market and nationally marketed securities." *Lander v. Hartford Life & Annuity Insur. Co.*, 251 F.3d at 111.

■ MONY contends that Gilmore's lawsuit is subject to removal and dismissal because it satisfies the requirements of subsections (b) and (c). In response, Gilmore argues that the MONY variable annuity is not a "covered security," as required by SLUSA in subsections (b) and (c) of § 77p.[1] Instead, Gilmore contends that MONY is an insurance company that is regulated under state insurance laws and that the MONY variable annuity is an insurance product. In addition, according to Gilmore, even if the MONY variable annuity satisfies the definition of a "covered security," the McCarran–Ferguson Act, 15 U.S.C.A. §§ 1011–1015, operates to preclude the construction of "covered security" to include insurance products, such as the MONY variable annuity.

Gilmore does not dispute that his lawsuit is a "covered class action" as required by subsections (b) and (c) of § 77p. Therefore, for purposes of resolving the motions currently before the court, the only issue in dispute is whether the MONY variable annuity is a "covered security."

The SLUSA adopts the definition of "covered security" given subsection (2) of 15 U.S.C.A. § 77r(b).[2] *See* 15 U.S.C.A. § 77p(f)(3). Subsection (2) provides: "Exclusive Federal registration of investment companies [:] A security is a covered security if such security is a security issued by an investment company that has registered, or that has filed a registration state-

---

1. A "covered class action" means
   "(i) any single lawsuit in which—
   (I) damages are sought on behalf of more than 50 persons or prospective class members, and questions of law or fact common to those persons or members of the prospective class, without reference to issues of individualized reliance on an alleged misstatement or omission, predominate over any questions affecting only individual persons or members; or
   (II) one or more named parties seek to recover damages on a representative basis on behalf of themselves and other unnamed parties similarly situated, and questions of law or fact common to those persons or members of the prospective class predominate over any questions affecting only individual persons or members; or
   (ii) any group of lawsuits filed in or pending in the same court and involving common questions of law or fact, in which—
   (I) damages are sought on behalf of more than 50 persons; and
   (II) the lawsuits are joined, consolidated, or otherwise proceed as a single action for any purpose."
   15 U.S.C.A. § 77p(f)(2)(A).

2. Section 77r(b) provides:
   "For purposes of this section, the following are covered securities:

(1) Exclusive Federal registration of nationally traded securities
A security is a covered security if such security is—
(A) listed, or authorized for listing, on the New York Stock Exchange or the American Stock Exchange, or listed, or authorized for listing, on the National Market System of the Nasdaq Stock Market (or any successor to such entities);
(B) listed, or authorized for listing, on a national securities exchange (or tier or segment thereof) that has listing standards that the Commission determines by rule (on its own initiative or on the basis of a petition) are substantially similar to the listing standards applicable to securities described in subparagraph (A); or
(C) is a security of the same issuer that is equal in seniority or that is a senior security to a security described in subparagraph (A) or (B).
(2) Exclusive Federal registration of investment companies
A security is a covered security if such security is a security issued by an investment company that his registered, or that has filed a registration statement, under the Investment Company Act of 1940."
15 U.S.C.A. § 77r(b).

ment, under the Investment Company Act of 1940." 15 U.S.C.A. § 77r(b).

Subsection 2) contains three requirements, each of which must be satisfied in order to have a "covered security": (1) there must be a security; (2) the issuer or the security must be an investment company; and (3) the investment company must be registered, or have filed a registration statement, under the Investment Company Act of 1940. *See* 15 U.S.C.A. § 77r(b)(2). The court will examine whether each of these elements is satisfied in the present case.

In *Securities and Exchange Commission v. Variable Annuity Life Insurance Company of America*, 359 U.S. 65, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959), the Supreme Court considered whether variable annuities are 'securities.' There, the Securities and Exchange Commission (SEC) sought to enjoin Variable Annuity Life from issuing its variable annuity contracts to the public without registering them under the Securities Act of 1933 and complying with the Investment Company Act of 1940. *See* 359 U.S. at 66, 79 S.Ct. at 619. The SEC maintained that the variable annuities are "securities" and, therefore, must be registered. *See id.* at 66–68, 79 S.Ct. at 619–20. Variable Annuity Life responded that its variable annuities are contracts of insurance and thus are expressly exempt from the registration requirements of the federal securities laws. *See id.* at 67, 79 S.Ct. at 620. It also argued that, even if the variable annuities are "securities," the McCarran–Ferguson Act bars the SEC from requiring their registration because Variable Annuity Life and the variable annuities are regulated under state insurance laws. *See id.* at 67, 79 S.Ct. at 619–20.

Agreeing with the SEC, the Supreme Court held that variable annuities are "securities," not insurance, and therefore that neither the McCarran–Ferguson Act nor the exemptions to the federal securities laws save Variable Annuity Life's variable annuities from the SEC's registration requirements. *See id.* at 71–72, 79 S.Ct. at 622.

In reaching its holding, the Supreme Court began by comparing traditional fixed annuities with variable annuities. *See id.* at 69–70, 79 S.Ct. at 621. The Court found that fixed annuities offer the annuitant specified, definite amounts beginning with a certain year of his or her life, *see id.* at 69, 79 S.Ct. at 621; in contrast, with variable annuities, premiums are invested more heavily in stocks, and benefit payments vary with the success of the investment policy. *See id.* "The holder of a variable annuity cannot look forward to a fixed monthly or yearly amount in his advancing years. It may be greater or less, depending on the wisdom of the investment policy." *Id.*

The Supreme Court acknowledged that actuarially fixed and variable annuities are calculated by identical principles. *See id.* Specifically, with each type of annuity, the issuer assumes the risk of mortality from the moment the contract is issued. *See id.* Even so, according to the Court, the dispositive difference between the two types of annuities is that "absent some guarantee of fixed income, the variable annuity places all of the investment risks on the annuitant, none on the company," while the fixed annuity places those risks on the company. *Id.* at 71, 79 S.Ct. at 621. That difference precludes variable annuities from being insurance because "the concept of 'insurance' involves some investment risk-taking on the part of the company." *Id.* at 71, 79 S.Ct. at 622. Insurance requires a guarantee that at least some fraction of the benefits will be payable in a fixed amount. *See id.* Although the companies that issue variable annuities assume the risk of failure, they do not guarantee

anything to the annuitants except an interest in a portfolio of common stocks or other equities, "an interest that has a ceiling but not floor." *Id.* at 71–72, 79 S.Ct. at 622. As such, the Court concluded that variable annuities present the issuer with no true underwriting risk, the earmark of insurance. *See id.* at 72, 79 S.Ct. at 622–23.

In *Securities and Exchange Commission v. United Benefit Life Insurance Company*, 387 U.S. 202, 87 S.Ct. 1557, 18 L.Ed.2d 673 (1967), the Supreme Court expressly clarified the implications of *Variable Annuity Life*. There, the SEC sought to enjoin United Benefit Life from offering its Flexible Fund Annuity contract without undertaking the registration requirements of federal securities laws. *See* 387 U.S. at 204, 87 S.Ct. at 1558. The Flexible Fund is a deferred annuity plan having characteristics similar to those of the variable annuities in *Variable Annuity Life. See id.* However, the Supreme Court found that there are significant differences between the Flexible Fund and the variable annuities at issue in *Variable Annuity Life. See id.* United Benefit Life claimed that these differences bring the Flexible Fund within the "optional annuity contract" and "insurance company" exemptions of federal securities laws. *See id.* at 204–05, 87 S.Ct. at 1558–59.

To resolve the issue, the Supreme Court examined the characteristics of the Flexible Fund. *See id.* at 205, 87 S.Ct. at 1559. It found that the major part of the Flexible Fund is invested in common stocks. *See id.* Prior to the Flexible Fund's maturity, purchasers are entitled to their proportionate share of the Flexible Fund and may withdraw all or part of this interest. *See id.* The purchasers are also entitled to an alternative cash value measured by a percentage of their net premiums. *See id.* At the Flexible Fund's maturity, the purchasers are entitled to receive either the cash value of their policies or a net premium payment, which is a certain fixed-amount payment life annuity. *See id.* at 205–06, 87 S.Ct. at 1559.

In the district court, the parties agreed that the provisions of the Flexible Fund dealing with the operation of the fixed-payment annuity at maturity were purely conventional insurance provisions, and thus are beyond regulation by the SEC. *See id.* at 206, 87 S.Ct. at 1559. However, the SEC argued that the portion of the Flexible Fund that dealt with the pre-maturity, or accumulation, period was separable and constituted a 'security.' *See id.* The district court rejected the SEC's position and found that the entire Flexible Fund is an insurance contract because it provided a guarantee of a fixed-payment annuity. *See id.* Relying on *Variable Annuity Life*, the court of appeals affirmed. *See id.* The appellate court read *Variable Annuity Life* to hold that the company must bear a substantial part of the investment risk associated with the contract in order to qualify its products as insurance. *See id.* at 206–07, 87 S.Ct. at 1559. The appellate court held that the Flexible Fund met this test because of the Fund's net premium guarantee and conversion to payments element, which included an interest element during the fixed-payment period. *See id.* at 207, 87 S.Ct. at 1559–60. The Supreme Court reversed. *See id.* at 207–12, 87 S.Ct. at 1560–63.

The Supreme Court agreed with the SEC that the Flexible Fund's accumulation period is separable and must be assessed independently of the maturity period. *See id.* at 207–10, 87 S.Ct. at 1560–61. The Court reasoned that the accumulation period and the maturity period present two entirely distinct promises and their operation is separated at a fixed point in time. *See id.* at 207, 87 S.Ct. at 1560. Specifically, during the accumulation peri-

od, United Benefit Life "promises to serve as an investment agency and allow[s] the policyholder to share in its investment experience." *Id.* at 208, 87 S.Ct. at 1560. In contrast, during the maturity period, United Benefit Life is acting in a role similar to that of a savings institution. *See id.*

Under these circumstances, the Supreme Court held that the accumulation portion of the Flexible Fund does not constitute insurance. *See id.* at 210–11, 87 S.Ct. at 1562. "[W]hile the guarantee of cash value based on net premiums reduces substantially the investment risk of the contract holder, the assumption of an investment risk [by the company] cannot by itself create an insurance provision...." *Id.* at 211, 87 S.Ct. at 1562. The Supreme Court stated that the appellate court read *Variable Annuity Life* too narrowly when it interpreted that decision to have turned solely on the absence of any substantial investment risk-taking on the part of the insurer. *See id.* at 210, 87 S.Ct. at 1561–62.

The *United Benefit Life* Court further held that the accumulation provisions of the Flexible Fund constitute an "investment contract" under federal securities laws. *See id.* at 211, 87 S.Ct. at 1562. As such, the Supreme Court concluded that the accumulation provisions of the Flexible Fund are nonexempt securities and must be registered with the SEC. *See id.* at 212, 87 S.Ct. at 1562.

■ Under *United Benefit Life,* the touchstone for determining whether a variable annuity is not insurance, for purposes of the McCarran–Ferguson Act and exceptions to federal securities laws, is whether its issuer "promises to serve as an investment agency ... allow[ing] the policyholder to share in its investment experience." *Id.* at 208, 87 S.Ct. at 1560. The assumption of an investment risk by the issuer does not alone allow a variable annuity to constitute insurance. *See id.* at 210–11, 87

S.Ct. at 1561–62. In light of these principles, the court will examine the terms of the MONY variable annuity to determine whether it is insurance.

The MONY variable annuity provides that the annuitant must make purchase payments to MONY. The annuitant's purchase payments are allocated, at the annuitant's choice, to the Guaranteed Interest Account and/or the subaccounts of MONY America Variable Account A. Those purchase payments can accumulate for a period of time and create 'cash values' for the annuitant. The annuitant may chose the length of time such purchase payments accumulate and may also chose to receive annuity benefit payments in the future based upon the accumulated "cash values."

MONY America Variable Account A is a separate investment account of MONY. Only purchase payments for the MONY variable annuity are permitted to be allocated to the MONY America Variable Account A. The assets in the MONY America Variable Account A are kept separate from MONY's other assets and accounts of MONY. The MONY America Variable Account A consists of nine subaccounts. The annuitant may allocate some or all of his purchase payments into one or more of these subaccounts. Each of these subaccounts invests in, among other things, money market instruments, bonds, and stocks. The purchase payments allocated "among the various subaccounts on MONY America Variable Account A may increase or decrease in value on any day depending on the investment experience of the subaccounts ... select[ed]. There is no guarantee that the value of the purchase payments ... allocate[d] to any of the subaccounts ... will increase. or that the purchase payments [made] will not lose value." Similarly, the annuitant "bear[s] the entire investment risk for all

amounts allocated to MONY America Variable Account A subaccounts."

Unlike the MONY America Variable Account A, the Guaranteed Interest Account is part of MONY's general account. Purchase payments allocated to the Guaranteed Interest Account earn an interest rate to be determined by MONY, but not less than 3.5 %.

The court finds that the MONY variable annuity is similar to the Flexible Fund in *United Benefit Life* in that it contains a portion—the MONY America Variable Account A—which, like the accumulation portion of the Flexible Fund, places all of the investment risk on the purchaser and another portion—the Guaranteed Interest Account—which, like the maturity portion of the Flexible Fund, offers the annuitant a fixed return. This similarity to the Flexible Fund requires the court to analyze the MONY America Variable Account A separate from the Guaranteed Interest Account for purposes of determining whether the MONY America Variable Account A is insurance or a security.[3] Moreover, the facts of this case warrant analyzing the MONY America Variable Account A separately. Specifically, only the MONY America Variable Account A is relevant to Gilmore because he opted to allocate 100% of his purchase payments to three of its subaccounts. Gilmore did not allocate any of his purchase payments to the Guaranteed Interest Account. For these reasons, the court will examine the MONY America Variable Account A separately to determine whether it is insurance or a security.

As discussed, under the MONY America Variable Account A, the annuitant allocates his purchase payments to subaccounts each of which invests in money market instruments, bonds, stocks, and like instruments. The purchase payments allocated "among the various subaccounts on MONY America Variable Account A may increase or decrease in value on any day depending on the investment experience of the subaccounts ... select[ed]." The annuitant "bear[s] the entire investment risk for all amounts allocated to MONY America Variable Account A subaccounts." In other words, MONY has promised to serve as the annuitant's investment agency, expressly allowing the annuitant to share in the subaccounts' investment experience, be it good or bad. Under similar circumstances, the *United Benefits Life* Court held that the accumulation portion of the Flexible Fund is not insurance. *See id.* at 211, 87 S.Ct. at 1562. Therefore, the MONY America Variable Account A is not insurance.

The McCarran–Ferguson Act provides, in relevant part, that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance ... unless such Act specifically relates to the business of insurance." 15 U.S.C.A. § 1012(b). Because the MONY America Variable Account A is not insurance, the McCarran–Ferguson does not preclude construing the MONY America Variable Account A to be a "covered security." *See Group Life & Health Ins. Co. v. Royal Drug Co.,* 440 U.S. 205, 210–11, 99 S.Ct. 1067, 1073, 59 L.Ed.2d 261 (1979) (recognizing that the McCarran–Ferguson Act applies to the "business of insurance," not the "business of insurers," so as to not exempt from federal antitrust laws insurers' actions which are not properly characterized as the "business of insurance"); *Securities and Exch. Comm'n v. National Sec., Inc.,* 393 U.S. 453, 459–

---

3. Unlike the Flexible Fund, the MONY variable annuity annuitant does not necessarily possess both portions because he may allocate 100 % of his purchase payments to either the MONY America Variable Account A or the Guaranteed Interest Account. However, this distinction is not relevant to the case at bar.

60, 89 S.Ct. 564, 568, 21 L.Ed.2d 668 (1969) (stating that the McCarran–Ferguson Act applies to insurance companies "only when they are engaged in the 'business of insurance' "); *see also Variable Annuity Life Ins. Co. of Am.*, 359 U.S. at 71–73, 79 S.Ct. at 622–23.

The next issue is whether the MONY America Variable Account A is a "security." Federal securities laws define "security" to include an investment contract. *See* 15 U.S.C.A. § 77b(a)(1).[4] The Supreme Court has defined "investment contract," as used in § 77b(a)(1), to mean "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party...." *Securities and Exch. Comm'n v. W. J. Howey Co.*, 328 U.S. 293, 298–99, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946). The Eleventh Circuit Court of Appeals has divided the *Howey* test into three elements: " '(1) an investment of money, (2) a common enterprise, and (3) the expectation of profits to be derived solely from the efforts of others.' " *Securities and Exch. Comm'n v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1199 (11th Cir.1999) (quoting *Villeneuve v. Advanced Bus. Concepts Corp.*, 698 F.2d 1121, 1124 (11th Cir.1983)). The MONY America Variable Account A satisfies the *Howey* test.

■ Under the first prong of the *Howey* test, an "investment of money" refers to an arrangement whereby an investor commits assets to an enterprise or venture in such a manner as to subject himself to financial loss. *See Securities and Exch. Comm'n v. Friendly Power Co., LLC*, 49 F.Supp.2d 1363, 1368–69 (S.D.Fla.1999). The MONY variable annuity requires the annuitant to make purchase payments, for which he or she bears the entire investment risk when they are allocated to the MONY America Variable Account A. Therefore, the MONY America Variable Account A satisfies the "investment of money" prong.

■ The second, or "common enterprise," prong is satisfied "where 'the fortunes of the investor are interwoven with and dependent on the efforts and success of those seeking the investment or of third parties.' " *Unique Fin. Concepts, Inc.*, 196 F.3d at 1199 (quoting *Villeneuve*, 698 F.2d at 1124). The MONY America Variable Account A consists of nine subaccounts in which annuitants may opt to invest their purchase payments. Each of these subaccounts invests in, among other things, money market instruments, bonds, and stocks. As such, each subaccount is not dependent upon the success of either the annuitant or MONY but, instead, upon the success of those seeking the investment or a third party. Therefore, the MONY America Variable Account A is a "common enterprise."

---

4. Under the federal securities laws the term "security" means

"any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a 'security', or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing."

15 U.S.C.A. § 77b(a)(1).

The third *Howey* prong requires that investors expect their profits to come solely from the efforts of others. *See* 196 F.3d at 1201. " '[T]he crucial inquiry [for the third prong] is the amount of control that the investors retain under their written agreements.' " *Id.* (quoting *Albanese v. Florida Nat'l Bank,* 823 F.2d 408, 410 (11th Cir.1987)).

As discussed, the MONY variable annuity allows annuitants to choose the subaccounts of the MONY America Variable Account A into which their purchase payments are invested. Each subaccount has a specified investment objective. Therefore, once an annuitant chooses in which subaccounts to invest, he or she effectively surrenders control of his or her money to the subaccounts' managers, as long as the money remains in those subaccounts. In other words, annuitants depend on the investment expertise of others once they designate into which subaccounts their purchase payments will be invested. As a result, the MONY America Variable Annuity A meets the third prong of the *Howey* test.

Because the MONY America Variable Account A satisfies the *Howey* test the court finds that it is an "investment contract" and thus a "security." The next issue is whether the MONY America Variable Account A is issued by an "investment company."

The Investment Company Act of 1940 provides that an

" 'investment company' means any issuer which—

(A) is or holds itself out as being engaged primarily, or proposes to engage primarily, in the business of investing, reinvesting, or trading in securities;

(B) is engaged or proposes to engage in the business of issuing face-amount certificates of the installment type, or has been engaged in such business and has any such certificate outstanding; or

(C) is engaged or proposes to engage in the business of investing, reinvesting, owning, holding, or trading in securities, and owns or proposes to acquire investment securities having a value exceeding 40 per centum of the value of such issuer's total assets (exclusive of Government securities and cash items) on an unconsolidated basis."

15 U.S.C.A. § 80a-3(a)(1).

MONY argues that the MONY America Variable Account A itself is an "issuer" that is or holds itself out as being engaged primarily, or proposes to engage primarily, in the business of investing, reinvesting, or trading in securities, namely, the MONY America Variable Account A. Therefore, MONY argues, the MONY America Variable Account A is issued by an "investment company."

In response, Gilmore concedes that the MONY America Variable Account A is a "separate investment vehicle" of MONY's that "is registered with the Securities Exchange Commission under the Investment Company Act of 1940 as a unit investment trust, which is a type of investment company." However, Gilmore contends that MONY is the issuer of the MONY America Variable Account A and that because MONY is an insurance company it is expressly exempted from the definition of "investment company." In support of his position, Gilmore relies solely on *Prudential Insurance Company of America v. Securities and Exchange Commission,* 326 F.2d 383 (3d Cir.), *cert. denied,* 377 U.S. 953, 84 S.Ct. 1629, 12 L.Ed.2d 497 (1964).

Gilmore is correct that *Prudential Insurance Company* directly addresses the issue of whether the MONY America Variable Account A is issued by an "investment company." However, the court is surprised that Gilmore relies on *Prudential Insurance Company* because that decision directly contradicts Gilmore's position.

The issue in *Prudential Insurance Company* was whether the Investment Company Act of 1940 applies to the Investment Fund resulting from the sale of variable annuity contracts to members of the public by Prudential Insurance Company of America. *See* 326 F.2d at 384. The variable annuity contracts that Prudential proposed to sell provide that the purchaser will make monthly purchase payments of fixed amounts over a period of years. *See id.* The purchase payments will be placed in an account, managed by Prudential, consisting of two subaccounts. *See id.* The first subaccount, the Investment Fund account, will have its assets invested primarily in common stocks. *See id.* The Investment Fund will be dedicated solely to the variable annuity contract holders and its assets will not be subject to claims of any other contract or policyholder of Prudential. *See id.* at 384–85. The second subaccount, the Other Assets account, is an administrative account that pays dividends to contract holders. *See id.* at 385.

At the administrative level before the SEC, Prudential argued that it was not required to comply with the Investment Company Act of 1940 because that Act specifically excludes insurance companies, such as itself, from its scope. *See id.* The SEC agreed that Prudential itself is not an "investment company" and, therefore, is excluded from the Act. *See id.* However, the SEC determined that the Investment Fund, created by Prudential, is an "investment company" within the coverage of the Act. *See id.* The SEC reasoned that the variable annuity contracts render the purchasers an "organized group of persons"; that the variable annuity contracts create a "trust" held by Prudential for these purchasers; and that the Investment Fund, which results from the sale of the variable annuity contracts, is a "fund" within the statutory definition. *See id.* at 386. As a result, the SEC concluded that the Investment Fund is the "issuer" of the variable annuity contracts and thus is an "investment company" subject to the Act. *See id.* On appeal, the Court of Appeals for the Third Circuit agreed. *See id.* at 388.

Before the appellate court, Prudential argued that the Investment Company Act of 1940 regulates only identifiable business entities with some sort of internal organization. *See id.* at 386. Prudential acknowledged that it is such an entity but argued that the Investment Fund is not. *See id.* Therefore, according to Prudential, the Investment Fund is not subject to the statute. *See id.*

In rejecting Prudential's argument, the appellate court relied primarily on the legislative history of the Investment Company Act of 1940. *See id.* at 387. The appellate court found that the Committee reports of both the House and the Senate state that the Investment Company Act of 1940 was drafted principally on the basis of reports submitted by the SEC following an extensive study of investment trusts and investment companies undertaken at the direction of Congress. *See id.* Investment companies referred to in these reports included

> "those involving 'an agency relationship between the individual contributors to the fund and the management upon whom they confer substantially a power of attorney to act as agent in the investment of the moneys contributed. The group of individual investors is not a legal entity but rather constitutes in essence a combination of distinct individual interests.'"

*Id.* (quoting H.R.Doc. No. 707, 75th Cong., 3rd Sess. 24 (1939)). The appellate court also found significant the fact that the reports referred to an investment company known as the "Alexander Fund," which the reports described as " 'merely a descriptive name given to the commingled funds of numerous investors who employed W.

Wallace Alexander as their agent to invest such funds.' " *Id.* (quoting H.R.Doc. No. 707, 75th Cong., 3rd Sess. 46 (1939)).

Under these circumstances, the appellate court rejected Prudential's argument that the broad statutory phrase " 'a trust, a fund, or any organized group of persons whether incorporated or not' refers only to recognizable business entities." *Id.* Instead, the court found that the legislative history compels the conclusion that the Investment Fund is a "fund" as that term is used in the statute. *See id.* In so finding, the court found three facts significant. First, the Investment Fund is a completely segregated account, devoted to investing in securities. *See id.* Second, the cash for these investments is derived from payments made by the purchaser of the variable annuity contract. *See id.* And, third, it is the Investment Fund, and no other entity, in which the purchaser has an interest. *See id.* Therefore, the appellate court concluded that the Investment Fund is separable from the insurance company. *See id.* Accordingly, the appellate court further concluded that the Investment Fund, not Prudential, is the "issuer" of these securities for purposes of the Investment Company Act of 1940. *See id.* at 388. "Prudential would in fact be the writer of the contracts—the insurance and annuity promises and the obligation to set up the investment fund. But the [I]nvestment [F]und, the 'company' to which the investment interests relate, is the 'issuer' of those interests." *Id.* (internal quotations omitted).

The MONY variable annuity is materially identical to the variable annuity contracts at issue in *Prudential Insurance Company.* Specifically, like the variable annuity contracts, the MONY variable an-

nuity provides that, first, the purchaser will make monthly purchase payments of fixed amounts over a period of years; second, the purchase payments will be placed into one or both of two funds—the MONY America Variable Account A and the Guaranteed Interest Account—which are managed by MONY; and, third, the relevant fund—the MONY America Variable Account A—has its assets invested primarily in securities and will be dedicated solely to the variable annuity contract holders, and its assets will not be subject to claims of any other contract or policyholder of MONY. Furthermore, like Prudential, Gilmore argues that the definition of "investment company" in the Investment Company Act of 1940 applies only to identifiable businesses, of which MONY but not the MONY America Variable Account A is one. On the other hand, like the SEC in *Prudential Insurance Company,* MONY argues that it is separable from the MONY America Variable Account A for purposes of the Investment Company Act of 1940. Therefore, the material facts of *Prudential Insurance Company* are identical to those in the case at bar.

Here, the court finds that the reasoning of *Prudential Insurance Company* is persuasive and adopts the reasoning of *Prudential Insurance Company* and applies it here. The court, accordingly, finds that, for purposes of the Investment Company Act of 1940, the MONY America Variable Account A is separable from MONY, MONY America Variable Account A is the "issuer" of the MONY variable annuity,[5] and MONY America Variable Account A is, therefore, an "investment company." *See id.* Gilmore concedes that the MONY America Variable Account A is registered

**5.** The Investment Company Act of 1940 defines "issuer" as "every person who issues or proposes to issue any security, or has outstanding any security which it has issued."

15 U.S.C.A. § 80a–2(a)(22). Issuer was defined in a materially identical manner at the time of the *Prudential Insurance Company of America* decision. *See* 326 F.2d at 386 n. 4.

under the Investment Company Act of 1940.

In sum, because the MONY America Variable Account A is a "security" issued by an "investment company" that is registered under the Investment Company Act of 1940, it is a "covered security" under SLUSA. As discussed, the only issue in dispute in this matter is whether Gilmore's claims stem from his purchase of a "covered security." Because the court has answered that question in the affirmative, Gilmore's lawsuit satisfies the requirements of subsections (b) and (c) of 15 U.S.C.A. § 77p and accordingly is removable to this court and then due to be dismissed under SLUSA.[6] *See Lander v. Hartford Life & Annuity Insur. Co.*, 251 F.3d 101 (2nd Cir.2001) (purchasers' state-court class-action lawsuit was a "covered class action" under SLUSA; variable annuity contracts were "covered securities" under SLUSA; McCarran–Ferguson Act did not preclude application of SLUSA; and, as a result, state-court class-action lawsuit was removable to federal court and then due to be dismissed under SLUSA).

A separate and appropriate judgment will be entered.

## JUDGMENT

In accordance with the memorandum opinion entered today, it is the ORDER, JUDGMENT, and DECREE of this court that:

(1) The motion to remand, filed by Plaintiff Ivey Gilmore on February 25, 2000, is denied.

(2) The motion for summary dismissal or judgment on the pleadings, filed by defendant MONY Life Insurance Company of America on March 10, 2000, is granted, and this cause is dismissed without prejudice.

---

**6.** Because Gilmore's lawsuit is removable under section 77p(b) the court will not address

It is further ORDERED that all other pending motions are denied as moot. 15 U.S.C.A. § 77p(f)(2)(A).

---

MONY's alternative theories of removal jurisdiction.